IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| HUGH COATES, | § | CV. NO. SA-13-CV-255-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| EC&R DEVELOPMENT, L.L.C., A | § | |
| DELAWARE LIMITED LIABILITY | § | |
| COMPANY; TETRA TECH | § | |
| CONSTRUCTION INC.; and | § | |
| ANACACHO WIND FARM, LLC, | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

On October 27, 2014, the Court heard oral argument on the Motion

for Summary Judgment (Dkt. # 61) filed by Defendants Tetra Tech Construction,

Inc., EC&R Development, LLC and Anacacho Wind Farm, LLC (collectively,

"Defendants").   Kristina Culley, Kevin Kesser, and Chip Wagar, Esqs., appeared

on behalf of Defendants; Tom Hall, Esq., and Blake Dietzmann, Esq., appeared on

behalf of Plaintiff Hugh Coates ("Plaintiff").   After careful consideration of the

memoranda in support of and in opposition to the motion, and in light of the

parties' arguments at the hearing, the Court, for the reasons that follow, **GRANTS**

**IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment.

<u>BACKGROUND</u>

Plaintiff is a rancher who has run a cattle operation on the Mitchell Circle Bar Ranch ("Mitchell Ranch" or the "Property") since September 1976 where he raises cattle, horses, and other livestock ("MSJ," Dkt. # 61 at 3). Plaintiff renewed his lease of the Mitchell Ranch on July 26, 2010. ("Compl.," Dkt. # 1 ¶ 6.)

Tom Mitchell subsequently entered into an agreement with EC&R Development, LLC ("EC&R"),[1] by and through its subsidiary, Anacacho Wind Farm, LLC ("Anacacho"), to construct and operate 51 Vestas V100 1.815 M.W. wind turbine generators on the property leased by Plaintiff. (<u>Id.</u>; MSJ at 3.) Plaintiff also entered into a subordination and non-disturbance agreement with Tom Mitchell's successor in interest, Mitchell Circle Bar Limited, a Texas limited partnership, permitting the construction and operation of the wind turbine generators in question. (<u>Id.</u>)

Anacacho then entered into a construction agreement with Tetra Tech Construction ("Tetra") to assist in the construction of the wine turbines. (Compl. ¶ 7.) Plaintiff alleges that in the course of construction, Tetra Tech, supervised by

---

[1] Defendants state in their Motion that EC&R is "more commonly known as E.ON Climate & Renewables." (MSJ at 3.) For purposes of this order, the Court will refer to EC&R as either "EC&R" or "Defendant."

2

Anacacho, cut some interior fences on the Property, allowing his separated livestock to commingle.   (Id.)   Additionally, Plaintiff alleges that Tetra Tech cut perimeter fences on the leased property, allowing his livestock to escape the Property and allowing breeding stock to breed with other stock inappropriately. (Id.)   Plaintiff further contends that Tetra Tech routinely failed to close gates, left several openings in the inside and outside fences that were not timely repaired, and cut the fence and left open new wire gap gates between the Mitchell Ranch Property and another property, all resulting in the loss of livestock.   (Id.)

Although Plaintiff notified Defendants and the Mitchells of the problems in August of 2012, Plaintiff asserts Defendants continued to destroy fences, leave gates open, destroy water lines, and allow livestock to commingle and escape the premises.   (Id. ¶ 8.)   In the fall of 2012, Plaintiff hired helicopters on numerous occasions to attempt to find and gather the missing livestock, costing him $18,233.   (Id. ¶ 10.)

Further, Plaintiff alleges that Defendants, despite their representations, did not complete construction before the opening of deer season in fall 2012, and they failed to complete the roads according to state specs by not covering them with limestone and not applying enough water on the roads to keep dust from covering the vegetation.   (Id. ¶ 9.)   Plaintiff also maintains Defendants (1) breached a verbal contract with Plaintiff to purchase all water needed by

3

Defendants for the project at $0.42/barrel, and (2) breached an agreement with Plaintiff through which Plaintiff would supply limestone for Defendants' roads associated with the project at $10.25/yard of limestone.   (Id. ¶ 13.)

On March 28, 2013, Plaintiff filed suit against Defendants asserting causes of action for negligence and breach of contract.   (Dkt. # 1.)   On May 8, 2014, Defendants filed the amended Motion for Summary Judgment that is now before the Court.   (Dkt. # 61.)   Plaintiff filed a Response on May 21, 2014 (Dkt. # 62), and Defendants filed a Reply on May 28, 2014 (Dkt. # 63).

## STANDARD OF REVIEW

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).   The main purpose of summary judgment is to dispose of factually unsupported claims and defenses.   Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.   Id. at 323.   If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial.   ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc., 699 F.3d 832, 839 (5th Cir. 2012).   In

4

deciding whether a fact issue exists, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."   Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).   However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."   Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003).   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"   Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

<u>ANALYSIS</u>

Defendants have moved for summary judgment, arguing all of Plaintiff's claims fail as a matter of law because (1) there is no contract in which Defendants agreed to exclusively purchase water from Plaintiff; (2) there is no contract with Plaintiff for the purchase of limestone; (3) Plaintiff can produce no evidence that Defendants breached any duty of care or that Defendants exceeded the reasonable and necessary use of the leased premises; and (4) to the extent Plaintiff asserts a cause of action for negligence regarding the construction or roads, Plaintiff admits he has no damages or injuries related to the alleged negligent construction of roads.   (MSJ at 2.)

5

A.    <u>Breach of contract claims</u>

As identified above, Plaintiff asserts causes of action for (1) breach of a verbal contract with Plaintiff to purchase all water needed by Defendants for the project at $0.42/barrel, (2) breach of a verbal contract to pay for the cost of a generator and pump, (3) breach of an agreement with Plaintiff in which Plaintiff would supply limestone for Defendants' roads associated with the project; and (4) breach of the land lease by Defendants' failure to pay rentals pursuant to the land lease.   (Compl. ¶ 13; <u>id.</u> at 6.)

1.    <u>Breach of the water contracts</u>

Plaintiff alleges that Defendants agreed to purchase <u>all</u> water from Plaintiff, exclusively, and it was agreed that Tetra Tech would pay for a generator, a pump, and the attendant electrical hookups, which would later become the property of Plaintiff.   (Compl. ¶ 13.)   Plaintiff also alleges Tetra Tech agreed to pay him for the diesel required to replace the amount of water delivered to Tetra Tech.   (<u>Id.</u>)   Pursuant to this agreement, Plaintiff drilled a well; installed a generator, a pump, and electricity; and delivered 51,125 barrels of water to Tetra Tech at the agreed upon price.   (<u>Id.</u>)   However, Plaintiff alleges Tetra Tech breached the contract by failing to pay the cost of the generator or the pump to equip the well, and by failing to obtain all of its water from Plaintiff, instead going elsewhere for water.   (<u>Id.</u>)

6

a.    <u>Breach of contract to purchase all water</u>

Defendants move for summary judgment, arguing that Plaintiff has produced no evidence that a verbal or oral contract exists for the exclusive purchase of water.    (MSJ at 6.)    Defendants do not dispute that they in fact purchased and paid Plaintiff for some water that was taken off the Property; however, despite negotiations for the purchase of additional water, no contract was ever finalized.    (MSJ at 7.)

In support, Defendants attach the affidavit of Larry Toberman, the Tetra Tech representative with whom Plaintiff negotiated for water, in which he avers that Tetra Tech never had an exclusive agreement with Plaintiff for the purchase of all water needed for the project.    ("Toberman aff.," MSJ, Ex. D ¶ 6.) Toberman states that he negotiated with Plaintiff for the purchase of some water to be taken out of a lake on a property that Plaintiff owned or leased in close proximity to the project, and that he agreed Tetra Tech would purchase water from Plaintiff if financially and practically feasible.    (<u>Id.</u> ¶ 8.)

Tetra Tech was invoiced for the 51,125 barrels of water they purchased, and they paid Plaintiff $21,472.50 for the water.    (<u>Id.</u> ¶ 9.) However, no additional water was taken out of the lake because the lake did not contain enough water for project needs.    (<u>Id.</u> ¶ 10.)    Defendant alleges that there was not an efficient way for the water trucks to remove the water from the lake,

7

and in order for additional quantities of water to be taken from the property, a

pump and generator needed to be installed to facilitate the removal of water.   (<u>Id.</u>

¶ 10.)   Although Plaintiff had agreed to install a working pump and generator for

the water well, Toberman avers he was never able to do so; as a result, Tetra Tech

ultimately purchased additional water from the City of Bracketville.   (<u>Id.</u>)

In response, Plaintiff cites to the August 29, 2012 purchase order

reflecting the water purchase between Tetra Tech and Plaintiff.[2]   (Dkt. # 32, Ex.

C.)   He points to the following language from the purchase order, arguing it

demonstrates a fact issue as to the enforceability of the oral contract:

> If financially feasible, Tetra Tech will purchase water from the Coates
> property for $0.01/gal FOB – Quantity estimated; Water may also be
> billed at an alternate unit rate of $0.42/barrel.

(<u>Id.</u>)

However, the language in the purchase order is not evidence of an

agreement that Tetra Tech would purchase water <u>exclusively</u> through Plaintiff, as

he maintains.   In other words, Plaintiff alleges the Defendants breached an oral

contract with him by failing to purchase <u>all</u> of its water from Plaintiff; however,

there is no evidence of such an exclusive contract.   The evidence cited by Plaintiff

---

[2] Although he did not re-attach this evidence to his Response to Defendants'
<u>Amended</u> Summary Judgment motion, the Court will consider this evidence
attached to his Response to Defendants' original Motion for Summary Judgment in
the interest of thoroughness and for an accurate resolution of the issues presented.

does not show that Tetra Tech agreed to <u>only</u> purchase water from Plaintiff, but merely demonstrates what Defendant does not dispute—that it did agree to purchase, and did in fact purchase, some water from Plaintiff at a determined price.

Plaintiff cites <u>Meyer Farms, Inc. v. Texaco Producing, Inc.</u>, No. 07-98-0029-CV, 1999 WL 125725 (Tex. App. 1999), for the proposition that summary judgment is not proper because the "if financially feasible" language in the purchase order creates a fact issue as to the enforceability of the oral contract. (Dkt. # 62 at 3.)   That case, however, is distinguishable.

In <u>Meyer</u>, the Texas appellate court reversed the trial court's grant of summary judgment, concluding that the right to terminate Texaco's contract was ambiguous and, consequently, there was a genuine issue of material fact as to whether Texaco could terminate its contract for the purchase of gas.   <u>Id.</u> at *3. The contract at issue in <u>Meyer</u> provided: "Seller hereby grants, bargains, sells, and agrees to deliver to Buyer, and Buyer agrees to purchase and take from Seller <u>all</u> of the gas now or hereafter produced from the well . . . [unless] . . . "the purchase of gas . . . is or becomes unprofitable . . . ."   <u>Id.</u> at *2 (emphasis added).

The key difference between the contract in <u>Meyer</u> and the purchase order in the instant case, is that the <u>Meyer</u> contract specifically provided that the buyer agrees to purchase from Seller "<u>all</u> of the gas" produced.   Here, however, there is no evidence that Tetra Tech ever agreed to purchase <u>all</u> of Plaintiff's water

or that it agreed to purchase solely from Plaintiff; thus, the feasibility language argument espoused by Plaintiff does not support his position.

Plaintiff has produced no evidence that an alleged oral contract to purchase water exclusively from Plaintiff exists.    Accordingly, the Court **GRANTS** summary judgment to Defendants on Plaintiff's breach of contract claim based on a breach of an exclusive contract for water.

> b.   <u>Breach of contract to pay cost of generator and pump</u>

Plaintiff also asserts that Defendants breached a verbal contract with him to pay for a generator and a pump to equip the well, alleging that Defendant never paid for the cost of the generator or the pump.    (Compl. ¶ 13.) Defendants move for summary judgment, arguing that although Tetra Tech offered to pay for the cost of a pump and generator, this offer was contingent on Plaintiff making the pump and generator available and operational for providing water to the project.    Because Plaintiff was never able to provide the use of a water pump for the benefit of the project, Tetra Tech was forced to seek water elsewhere; thus, they were not obligated to pay the cost of the pump and generator.    (MSJ at 9.)

In Toberman's affidavit, he says:

> The lake on the property controlled by Mr. Coates did not contain enough water for the needs of the Project.    Further, there was not an efficient method for water trucks to remove the water from the lake. In order for additional quantities of water to be taken from this property, a pump and generator needed to be installed to facilitate the

removal of water.   Mr. Coates had agreed to install a working pump and generator for the water well, so that additional water could be taken for use at the Project.   <u>Mr. Coates was never able to install a working water pump on the premises</u>.   As a result, Tetra Tech had no choice but to seek other options for the purchase of water.   Tetra Tech ultimately purchased water for the Project from the City of Bracketville.

(Toberman aff. ¶ 10 (emphasis added).)   Defendants argue that assuming there was a legal contract between Plaintiff and Tetra Tech, Plaintiff was not able to perform his end of the agreement; therefore, Defendants were not obligated to pay him for a pump and generator.

In response, Plaintiff cites to photos of an alleged functioning water pump and generator.[3]   (Dkt. # 62 at 3.)   The photos depict a pump and generator, in working condition, pumping a large amount of water at a fast rate.   (<u>See</u> Dkt. # 32, Ex. B.)   Defendants argue that the photos are not properly authenticated because there is no accompanying affidavit authenticating their accuracy, nor establishing when they were taken.   Without such information, Defendants assert it is impossible to tell whether they were taken after water was no longer needed to be purchased in any significant quantity, therefore obviating their agreement to pay for the cost of the pump and generator.   (Dkt. # 63 at 5.)   However, Plaintiff has

---

[3] Plaintiff did not attach these photos to the Response to Defendant's Amended Motion for Summary Judgment, but attached them as Exhibit B to Plaintiff's Response to Defendants' original Motion for Summary Judgment.   However, the Court will again consider the evidence in the interest of thoroughness.

attached an affidavit which states:

> The photographs attached to the Response to Defendant's Motion for
> Summary Judgment herein are true and correct copies of the matters
> depicted therein.   Pursuant to my contract with Tetra Tech, I did
> provide a pump and generator that was in working order.

("Coates aff.," Dkt. # 32, Ex. D.)   At this stage of the case, the Court concludes

that Plaintiff's affidavit is sufficient to authenticate the photos.   While Plaintiff

does not specifically state the date the photos were taken, he does assert that he

provided the pump and generator in the working condition as they are depicted in

the photos, "[p]ursuant to [his] contract with Tetra Tech."   The clear inference is

that the photos were taken at a time when the water was still needed for the

project.[4]

---

[4] At the hearing, Plaintiff also directed the Court to the email chain attached as
Exhibit B to his response in which the photos of the working pump and generator
were attached.   A December 7, 2013 email from Shelly Liegl of Mazon
Associates to Mike Repholz at Tetra Tech states:

> [Plaintiff] told me that the work for invoice #3 (copy attached above)
> for $32,5000 for PO #1086404 to connect a generator and install a
> pump was completed 90 days ago.   He sent me 3 pictures to prove
> that this is the case (see above).   Also, the invoice is signed by Mr.
> Delaney for himself and yourself on August 29th.   We have a
> recording where your accounts payable department said that PO
> #1086404 was open and good and that all work had been completed.
> Therefore, can you email me back in detail the issue with invoice #3
> from the pictures above it appears that this needs to be approved for
> payment.

(Dkt. # 32, Ex. B (emphasis added).)   Plaintiff argues that this further

Defendants have moved for summary judgment on the basis that Plaintiff was never able to get a pump and generator working in time to meet the needs of the project.   (MSJ at 9.)   The photos, which Plaintiff avers demonstrate that the pump and generator were in working order "pursuant to [his] contract with Tetra Tech," create a genuine issue of fact as to whether Defendants were required to pay for the cost of their installation.   Thus, the Court **DENIES** summary judgment on this breach of contract claim.

c.     Breach of the limestone contract

Plaintiff has alleged that Defendant breached a contract for the purchase of crushed limestone.   (Compl. ¶ 13.)   Pursuant to the contract, Plaintiff built a road to the crusher site for the limestone and obtained a permit for a limestone crusher on the land.   However, Plaintiff alleges that Defendant breached the agreement by purchasing a cheaper alternative by-product as a substitute for the limestone.   (Id.)

Defendant argues that there is no evidence of a contract for the purchase of limestone because Plaintiff never actually negotiated for an agreement with Defendants for the purchase of limestone.   (MSJ at 6.)   Instead, Defendants assert that Lee Weir negotiated with Defendants, not Plaintiff; thus, Plaintiff must

---

demonstrates that the photos were taken 90 days prior to December 7, 2013, which would indicate that they were taken some time in early September 2013 at a time when water was needed for the project.

make a showing that he is a third party beneficiary and the contract was entered

into for his benefit in order to enforce the contract between Weir and Defendants.

(Id.)

       Defendants cite to the following testimony from Plaintiff's deposition,

arguing that it "confirms that there was no contract for the sale of limestone"

between Plaintiff and Tetra Tech:

> Q: So let's talk now about who at Tetra Tech you reached an oral
> agreement with.
> A: When Toberman asked me, he said, we want to get the limestone
> from you.   Do you have anyone that'll come in here and drill it, blast
> it, crush it with trucks and deliver it.   And – and I said, I do.   And I
> brought a guy in named Lee Weir with Weir – Weir is W-e-i-r –
> Construction in Fort Worth.   And he came down and visited with
> whoever was head of Tetra Tech on the job.   And they made a deal
> to drill, crush, blast and deliver that over to the – to the Mitchell job
> site.
> Q: Okay.
> A: And I was going to get a dollar out of it. So he negotiated the rest
> of it.
> Q: So do you know the terms that were negotiated by somebody from
> Weir?
> A: I don't.   All I know is that I was going to get a dollar, and they
> went over there and negotiated the contract with Tetra Tech.
> Q: Okay.   So you never actually negotiated that contract with Tetra
> Tech?
> A: That's correct.
> Q: Okay.   And you were going to benefit in that you would be paid a
> dollar per ton for a contract Weir negotiated with –
> A: That's correct.

(MSJ, Ex. H 104:3 – 141:1.)

       Plaintiff responds that the fact that the contract was negotiated by

14

another individual does not render it unenforceable.     (Dkt. # 62 at 4.)    Plaintiff

argues that this testimony indicates that although another individual negotiated the

terms of the contract with Tetra Tech, Plaintiff knew that he was going to get $1.00

per ton out of it.    (Id.)    Plaintiff also cites to a purchase order, addressing the

terms of the contract concerning the limestone.    (Id.)    The purchase order states:

"$1.00/tn royalty to [Plaintiff] for every ton of stone that is produced on the Coates

property and delivered by others for use by Tetra Tech Construction – Quantity

Estimated at 200000 tons @ $1.00/tn."    (Dkt. # 32, Ex. C.)    The purchase order

lists Tetra Tech as the buyer and Plaintiff's construction company (Coates

Construction Company) as the seller.    (Id.)    The purchase order states "This PO

is confirming the verbal agreements made 8/29/12."    (Id.)

              "The fact that a person might receive an incidental benefit from a

contract to which he is not a party does not give that person a right of action to

enforce the contract."    MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995

S.W.2d 647, 651 (Tex. 1999).    "A third party may recover on a contract made

between other parties only if the parties intended to secure some benefit to that

third party, and only if the contracting parties entered into the contract directly for

the third party's benefit."    Id.    In order to qualify as one for whose benefit the

contract was made, "the third party must show that he is either a donee or creditor

beneficiary of, and not one who is benefitted only incidentally by the performance

of, the contract."   Id.   "The intention to contract or confer a direct benefit to a

third party must be clearly and fully spelled out or enforcement by the third party

must be denied."   Id.   Thus, there is a presumption that the parties contracted for

themselves unless it "clearly appears" that they intended a third party to benefit

from the contract.   Id. (quoting Corpus Christi Bank & Trust v. Smith, 525

S.W.2d 501, 503–04 (Tex. 1975)).

   Here, it is not disputed that verbal agreements regarding the sale of

limestone for the project were entered into between Weir and Tetra Tech.

Plaintiff testified that when he was approached by Defendants about obtaining

limestone from Plaintiff, Plaintiff obtained the services of Weir Construction to

"drill it, blast it, crush it with trucks and deliver it."   Although Weir negotiated

the agreement with Defendants, the purchase order "confirming [the] verbal

arrangements made 8/29/12" clearly demonstrates that Plaintiff was to receive

"$1.00/tn royalty . . . for every ton of stone that is produced on the Coates property

and delivered by others . . . estimated at 200000 tons @ $1.00/ton."   This supports

Plaintiff's testimony that Weir Construction was to deliver the limestone produced

on Plaintiff's property, and Plaintiff was to receive $1.00/ton produced for it.

Thus, the purchase order "clearly demonstrates" that Weir and Tetra Tech intended

that Plaintiff receive a benefit from the contract and, accordingly, Plaintiff may be

considered a third party beneficiary under Texas law.

Defendants have moved for summary judgment on this claim on the basis that there is no evidence of a contract of any type between Plaintiff and Defendants.   However, the evidence produced by Plaintiff demonstrates the existence of an oral contract supported by the purchase order referenced above for the purchase of limestone, from which Plaintiff was specifically intended to receive $1.00 per ton.   Accordingly, the Court **DENIES** summary judgment on that claim.

> d.   Statute of Frauds

Defendants argue that the alleged contracts for the sale of water, limestone, a water pump, and a generator are not enforceable under the statute of frauds.   (MSJ at 11.)

Texas Business and Commerce Code § 2.201 provides:

(a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.   A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods show in such writing.
. . .
(c) A contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable
. . .
(2) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for

17

>sale was made, but the contract is not enforceable under this
>provision beyond the quantity of goods admitted . . .

Tex. Bus. & Comm. Code § 2.201.

A memorandum must meet three requirements to be sufficient under Texas's statute of frauds: (1) it must evidence a contract for the sale of goods; (2) it must be signed by the party against whom enforcement is sought; and (3) it must specify a quantity.   See id., cmt. 1.   Plaintiff cites to the purchase order, arguing it satisfies the statute of frauds.   (Dkt. # 62 at 6.)   The Court agrees.

The purchase order clearly states it is "confirming verbal arrangements made 8/29/12."   (Dkt. # 32, Ex. C.)   It clearly identifies an order number, the buyer and the seller, and it describes the items contracted for sale. Specifically, it states (1) an estimated quantity of 20,000 tons of limestone produced on Plaintiff's property, for which Tetra Tech will pay $1.00 a ton for a total price of $20,000; (2) an estimated quantity of 9,000,000 gallons of water from Plaintiff's property at $0.01/gal or $0.42/barrel, for a total price of $90,000; (3) one generator for a water well at a price of $6,500; and (4) one pump for a water well at a price of $23,500.   Finally, the purchase order is signed by Gina Weil-Serafin, who is identified in the purchase order as the representative for the buyer, Tetra Tech.

Commentary to § 2.201 provides, "[t]he required writing need not

18

contain all the material terms of the contract and such material terms as are stated

need not be precisely stated.    All that is required is that the writing afford a basis

for believing that the offered oral evidence rests on a real transaction."    <u>See</u> Tex.

Bus. & Comm. Code § 2.201, cmt. 1.    The Court concludes that the purchase

order in this case meets those requirements.    Accordingly, the Court **DENIES**

Defendants' Motion for Summary Judgment on the basis that the alleged oral

contracts are outside the statute of frauds.[5]

e.    <u>Breach of the land lease</u>

Plaintiff has also asserted a breach of contract action based on the

alleged failure of Defendants to pay the rental pursuant to a land lease.    (Compl.

at 6.)    Defendants move for summary judgment on this claim, arguing that they

fully performed under the lease and sent payments to Plaintiff at a remittance

address frequently used by him on his business invoices for Coates Construction.

(MSJ at 14–15.)

In response, Plaintiff simply argues:

> The complaint that Mr. Coates has with the payment of the rental of
> the land lease is that the payments were not made to Mr. Coates, but
> were made to a factoring entity.    Mr. Coates never received the
> payment from the factoring entity, and no one instructed that the lease

---

[5]  The Court has granted summary judgment on Plaintiff's claim for breach of a
contract to exclusively purchase water from Plaintiff for the reasons set forth
above.    Thus, the Court need not address the applicability of the statute of frauds
as it relates to that alleged oral contract.

payment be made to the factoring entity.

(Dkt. # 62 at 6.)   Plaintiff cites to no evidence in support of this assertion.

However, the Court, in carefully reviewing the record, has found the following

statement in Plaintiff's affidavit:

> With regard to the surface lease . . . I never received the $15,000.00 in
> payments, contra to the allegations in the Defendants' Motion.   That
> money was sent to a factoring company I used for some, but not [all]
> purposes, and erroneously credited to a different unpaid invoice.

(Dkt # 32, Ex. D.)[6]   However, even considering this evidence, Plaintiff's

statement does not create a fact issue that Defendants breached the contract by

failing to pay rentals.   In fact, Plaintiff admits that he was paid the money, only

that the money was credited to a different invoice that he used for some purposes.

Plaintiff has brought no evidence to show that Defendants breached

the land lease by failing to pay, and he admits that the checks totaling $15,000.00

were in fact sent by Defendants.   Accordingly, the Court **GRANTS** Defendants'

Motion for Summary Judgment on this claim.

B.   Negligence claims

Defendants also move for summary judgment on all of Plaintiff's

negligence claims, arguing that Plaintiff (1) has no evidence that Defendants owed

---

[6] This affidavit, once again, is not attached to his response before the Court now,
but to his response to the original mooted Motion for Summary Judgment filed by
Defendants.

a legal duty of care to him, a tenant on the property subject to a subordination agreement, and (2) has no evidence that Defendants breached a duty of care with respect to the leased premises.   (MSJ at 16.)   Defendants also argue that because Plaintiff signed a Subordination and Nondisturbance Agreement, he agreed to subordinate his rights and eliminate any duty that Defendants might have to the farming/grazing tenant with regard to fence placement, fence cuts, fence replacement, or road placement.   (Id.)

In support of a claim for negligence, a plaintiff must establish (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty, and (3) damages proximately caused by the breach.   Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778,782 (Tex. 2001).

1. Existence of a Duty

Defendants first argue that Plaintiff has identified no statutory or contractual duty owed by Defendants to Plaintiff; therefore, Defendants assert that Plaintiff's claim for negligence fails as a matter of law.   (MSJ at 16.)

a.    Contractual duties

Defendants assert that Plaintiff had no contract with Tetra Tech with respect to fencing or roads; thus, he cannot demonstrate the existence of a contractual duty.   (Id.)

The Surface Lease Agreement signed by Mitchell Circle Bar (the

"Landowner") and Anacacho Wind Farm provides the following.

    Landowner's Use.    At all times during the term of this Agreement, Landowner shall have and <u>reserves unto Landowner and Landowner's heirs, successors and assigns</u>, <u>the right to use all or any of the Premises for</u> all existing and future uses and activities which do not unreasonably interfere with Lessee's rights granted under this Agreement, such as <u>farming, ranching and other agricultural uses</u> . . . . Lessee understands and accepts that Landowner has a substantial agricultural, as well as hunting operation upon the Premises, and that Landowner is reserving all of Landowner's rights to continue to conduct those operations upon the Premises so long as the same do not unreasonably interfere with the rights granted to Lessee under this Agreement.    In this regard, Lessee agrees to provide Landowner, at Landowner's address listed herein, as well as to Landowner's attorneys, written notice within a reasonable amount of time, in advance of any construction activities on the Premises, so as to minimize the disruption of Landowner's operations.

. . .

        f.  Installation and Maintenance of the Improvements

    a. Installation of Improvements.    Other than the Wind Energy Project, Lessee shall not cause any improvements to be installed on the Premises without the prior written consent of the Landowner, which consent shall not be unreasonably withheld or delayed. . . .    Also, <u>Lessee agrees that should it be necessary to move fences during construction, that Lessee will give Landowner sufficient advance notice and will install temporary fences, as needed.    Before cutting fences, Lessee shall ensure that such fences be braced first with a metal "H" brace (with steel pipe and stabilizers).</u>

    b. Use, Construction, and Maintenance of Roads, Fences, Gates and Cattle Guards. . . . .    Lessee may install gated entries with cattle guards, if requested, for ingress and egress on, over and across such roads after consulting with Landowner as to the kind, quality and location of said gates and cattle guards. <u>Before cutting fences, Lessee shall ensure that such fences be</u>

> braced first with a metal "H" brace (with steel pipe and
> stabilizers).

(MSJ, Ex. C (emphases added).)

Plaintiff argues that, as a surface lessee, he is one of the "assigns" of those rights granted to the Landowner, Mitchell Circle Bar.   (Dkt. # 63 at 7.)   An "assignee" is defined as "[o]ne to whom property rights or powers are transferred by another."   Black's Law Dictionary (9th ed. 2009).   However, even assuming Plaintiff is an "assign" of the Surface Lease Agreement, any alleged duty under the contract cannot give rise to a negligence claim.

"[W]here parties to a lawsuit have contractual obligations to one another, the Texas Supreme Court has established a two-part test to determine whether a plaintiff may assert a tort claim alongside a breach of contract claim." Coachmen Indus, Inc. v. Willis of Ill, Inc., 565 F. Supp. 2d 755, 771 (S.D Tex. 2008).   First, the court must look to whether the defendant's conduct "would give rise to liability independent of the fact that a contract exists between the parties." Id. (quoting Sw. Bell Tel. Co. v. DeLanney, 809 S.W.2d 493, 494 (Tex. 1991)). The court then looks to the nature of injury.   Id.   "When the injury is only the economic loss to the subject to of a contract itself[,] the action sounds in contract alone."   Id.   "Thus, 'in order for a tort duty to arise out of a contractual duty . . . the liability must arise "independent of the fact that a contract exists between the

parties"; the defendant must breach a duty imposed by law rather than by contract.'"   Id. (quoting Wilcox v. Am. Home Assurance Co., 900 F. Supp. 850, 863 (S.D. Tex. 1995)).

Here, any alleged duties regarding the fences arise out of the contract and do not give rise to liability independent of the fact that a contract exists.   The responsibilities of Defendants to ensure fences are braced with a metal "H" brace exist only because of the contractual relationship created by the Surface Lease Agreement.   Accordingly, any tort duties do not arise out of any alleged contractual duties stated in the Surface Lease Agreement.

> b.   Common law duty

However, Plaintiff also argues that Defendants had a duty to act reasonably in their operations.   (Dkt. # 62 at 6–7.)   Defendants agree that the principles of oil and gas law apply here, as Defendants are lessors of the surface for the purposes of energy production.   (MSJ at 19.)

"A corollary of mineral owner's right to use the surface to extract his minerals is the rule that the mineral owner is held liable to the surface owner only for negligently inflicted damages to the surface estate."   Moser v. U.S. Steel Corp., 676 S.W.2d 99, 103 (Tex. 1984).

Plaintiff cites to Lynn v. Maag, 220 F.2d 703 (5th Cir. 1955), in which the Fifth Circuit held:

> We think it clear under the law of Texas that even though a mineral lessee is held to enjoy a dominant estate over that of his lessor, there is upon him a <u>general duty to make reasonable use of the premises in accordance with the provisions and general purpose of the lease and to exercise reasonable care in his use, having due regard to the rights of the owners of servient estates</u>.   Since this general duty existed, it follows that any act or omission by appellant (or legally imputable to him) which was unreasonable or which should have been avoided in the exercise of ordinary care would constitute a breach of that duty.

<u>Id.</u> at 705 (internal citations omitted) (emphasis added).   Defendants respond that the general duty to act reasonably only applies to negligently inflicted damages to the surface estate (MSJ at 19), and because Plaintiff asserts damages to loss of cattle and not to the surface estate, the duty does not apply.

In response, Plaintiff cites <u>Texaco, Inc. v. Spires</u>, 435 S.W.2d 550, 553 (Tex. App. 1968), where a landowner sued his oil and gas lessee, claiming that the lessee had negligently maintained a cattle guard on the premises in question, causing the landowner's horse a broken leg that ultimately required the horse to be destroyed.   In <u>Texaco</u>, the court stated:

> It is true, as appellant contends, that the grant of an oil and gas lease carries with it the right to use so much of the land as is reasonably necessary to comply with the terms of the lease and to effectuate its purposes, and that damages resulting to the owner of the surface by reason of such necessary use by the lessee are not recoverable. <u>Warren Petroleum Corporation v. Martin</u>, 153 Tex. 465, 271 S.W.2d 410, (1954). The above announced rule however is not here applicable. It is an equally well established rule, which is here controlling, that <u>the owner of the surface is entitled to recover damages when the oil and gas lessee has been negligent in the use of the surface owner's land</u>. Although the surface estate is servient to the mineral estate under an oil

and gas lease for the purpose of the mineral grant, still the right of the oil and gas lessee must be exercised with due regard to the rights of the owner and he owes the duty to the surface owner not to negligently injure the surface owner in the operation of his estate. Contrary to appellant's contention, <u>the owner of an oil and gas lease is liable for injury to livestock belonging to the owner of the surface estate caused by the lessee's negligence in the operation of the mineral lease.</u>

<u>Texaco</u>, 435 S.W.2d at 553 (emphasis added).

The Court concludes that a duty existed between Defendants and Plaintiff.   Here, Plaintiff was the farming tenant of the property and therefore had rights in the servient estate.   Defendants, as the "mineral" lessees, had a duty to act reasonably in conducting their operations.   Accordingly, there is a common law duty owed to Plaintiff.

    2.  <u>Effect of the Subordination Agreement on common-law duty owed to Plaintiff</u>

Defendants additionally argue that because Plaintiff signed a Subordination and Nondisturbance Agreement, he agreed to subordinate his rights and, thus, eliminated any duty that Defendants might have to Plaintiff as the farming/grazing tenant with regard to fence placement, fence cuts, fence replacement, or road placement.   (MSJ at 16.)

Plaintiff responds that the Subordination Agreement he signed does "nothing more and nothing less than create a dominant/servient estate relationship which is analogous to an oil and gas situation where the mineral estate is the

dominant estate and the surface estate is the servient estate."   (Dkt. # 62 at 6.)

Accordingly, the crux of Plaintiff's argument is that the Subordination Agreement

creates no change in the Defendants' duty to act reasonably in their operations.

In Robinson Drilling Co. v. Moses, 256 S.W.2d 650 (Tex. App.

1953), circumstances gave rise to the same type of duty.   There, Moses, the

farming tenant on property that was subsequently leased by an oil and gas lessee

(Robinson), sued, contending that Robinson destroyed his cotton field in the course

of its drilling operations.   Id. at 650.   The trial court granted judgment in the

favor of plaintiff.   On appeal, Robinson argued that the trial court erred in

rendering any judgment for a plaintiff who was a tenant in possession of the

surface of the land under an oral rental agreement that was subject to the oil and

gas lease, when the Plaintiff failed to allege that Robinson was negligent or used

more land than was reasonably necessary in its drilling operations.   (Id.)

The court noted that Moses entered into an oral rental contract for the

land under a year-to-year tenancy.   (Id.)   Therefore, at the yearly lease renewal

following the execution of the oil and gas lease, Moses had notice and actual

knowledge of the oil and gas lease on the property.   Accordingly, the court found

that Moses's surface lease was subject to Robinson's rights under the oil and gas

lease.   As the court stated,

[w]here the lessee of the surface of land takes same subject to an oil

27

and gas lease, the holder of the oil and gas lease, in the absence of a
specific clause relating to surface damages, has the right to use as
much of the surface and to use it in such manner as is reasonably
necessary to effectuate the purpose of the lease.   A lessee of the
surface who seeks to recover damages in such cases has the burden of
alleging and proving either specific acts of negligence . . . or that more
land was used for the drilling operation than was reasonably
necessary.

Id. (internal citations omitted).

Moses and the instant case are analogous—here, like in Moses, the

Plaintiff's grazing lease was subject to Defendants' rights under the Wind Surface

Lease.[7]   In Moses, the plaintiff took the surface lease subject to a prior oil and gas

lease, thus rendering his lease "subject to" the oil and gas lease; here, Plaintiff

signed an agreement to subordinate his rights in his surface/grazing lease to

Defendants' lease, therefore agreeing to make his prior surface lease subject to

Defendants' subsequent Wind Surface Lease.   Plaintiff does not dispute that his

grazing is subject to the Wind Surface Lease.   Rather, Plaintiff maintains that the

Defendants breached the duty that they owed his servient estate, and that duty

persisted despite the Subordination Agreement.   The Court agrees.

As in Moses, where a surface lessee such as Plaintiff, whose lease is

subject to the holder of an oil and gas lease (or in this case, a Wind Surface Lease),

---

[7]  The Subordination Agreement reads "Optionee/Tenant" [EC&R] will not go
forward with the development of the Project without the Grazing Lease being
subordinate and subject to the terms of the Wind Lease and the rights of
Optionee/Tenant thereunder[.]"   (MSJ, Ex.F.)

the mineral lessee has the right to use as much of the surface and to use it in such

manner as is reasonably necessary to effectuate the purpose of the lease.

However, if the mineral lessee acts <u>unreasonably</u> in its operations, a surface tenant

may seek damages for those actions, despite the fact that his lease is subordinate to

the mineral lessee.   See <u>id.</u> ("A lessee of the surface who seeks to recover

damages in such cases [where he has taken the land subject to an oil and gas lease]

has the burden of alleging and proving either specific acts of negligence . . . or that

more land was used for the drilling operation than was reasonably necessary.").

The fact that Plaintiff signed a Subordination Agreement, making his farming lease

subordinate and subject to the terms of the Wind Surface Lease, does not erase the

common-law duty to act reasonably in conducting operations; nothing in the

Subordination Agreement states as much, and case law indicates that even when a

surface tenant's lease is subject to a lease such as the Wind Surface Lease, the

surface tenant may still seek damages by demonstrating the Wind Surface lessee

acted unreasonably in its operations.[8]

---

[8] The Court notes that Defendants state in their Motion:

> [a]t the onset of the construction, Defendants had a duty not to
> willfully injure or harm the ranching or hunting operation.   However,
> cutting and relocating fences and gates is another matter.
> Defendants were allowed to construct roads and turbines and had
> reasonable use of the leased premises to facilitate the construction of
> the Project.   With a construction project on the scale of the Project, it

Accordingly, the Court concludes that the Subordination Agreement signed by Plaintiff did not eliminate Defendants' common-law duty to act reasonably in conducting operations on the property.[9]

### 3. Evidence Defendants acted unreasonably

Defendants next argue that even assuming there is a duty, there is no evidence that Defendants' use of the leased premises exceeded what was reasonable and necessary under the Surface Lease.[10] (MSJ at 19.)

In response, Plaintiff attached the deposition testimony of Larry Boatwright, an employee of Defendants.   Boatwright testifies:

Q: . . . [T]he destruction of fences and leaving gates open on this job. Were you – were you privy to that?

---

was <u>reasonable and necessary for Defendants to cut fences</u>, relocate fences and install gaps and gates.

(MSJ at 22.)   Ostensibly, Defendants agree that they must conduct their operations reasonably, but assert that cutting fences was reasonable under the circumstances.   Here, however, Plaintiff has argued that Defendants cut the fences negligently (i.e., unreasonably); he does not dispute that Defendants had the right to cut fences in a reasonable manner.   (Dkt. # 62 at 9.)

[9]  The Court notes that without the Subordination Agreement, Defendants would in all likelihood have owed a higher duty to Plaintiff as Defendants' Wind Surface Lease would have been subject to Plaintiff's earlier grazing surface lease of the property.

[10]  Defendants also argue that they were contractually entitled to cut fences on the property.   (MSJ at 19.)   Plaintiff responds that he does not dispute this, but argues that the manner in which Defendants went about cutting the fences was the negligent conduct he complains of.   (Dkt. # 62 at 9.)

A: Well, where that road began there between the laydown yard it's just a little gated area.    Right up from that was an existing gate. They cut that line – that gate down and it's pretty much where they kept the horses because the horses were always up and around where we'd go to the laydown yard, so he wanted to keep the horses separated from the rest of the ranch, but I know they took that gate out because the gate was gone.    When they started cutting that road, the subgrade for the road, they just pushed the gate down out of the way and then pushed the fence back out of the way 60, 80 feet wide.    I know it stayed like that several days.

Q: When you say they, who is they?

A: Tetra Tech. . . . .

Q: Did you have – you have some job responsibility with regard to preventing gates from being mowed down like that?

A: As far as I knew – I knew it wasn't right, but there wasn't anything I could do other than address my supervisor about it Tommy Simons. That's what I did.    I think he tried to get ahold of them and get those things closed up.    I'm not sure.

Q: Were there situations where gates and/or fences were taken down other than the one that you described?

A: Yeah.

[Objection: Form]

A: Yeah, I guess between the – I can't think of the tower number.    It was up on the top of the hill between Mr. Coates and the landowner to the east of him there.    That – that fence and gate was down.    I remember looking at it.    I took some photographs of it, but I don't know what when with them, but when I pulled up on it the gate was – there wasn't any gate.    It was just a cut fence and it was gapped probably 60 to 80 feet, maybe a little wider.    The fence had just been cut and pushed back out of the way and there wasn't anybody there

<u>when I pulled up and that bothered me a good bit.   And I addressed it with Mr. Simons as well because as a rule you have either someone there or you have a gap, stock, things like that.</u>

Q: Was that a perimeter fence that you're talking about?

A: I believe so.

(MSJ, Ex. C 11:1–12:23 (emphases added).)    The Court concludes that this evidence at least creates a genuine issue of material fact as to whether Defendants were unreasonable in their operations on the property.   Boatwright specifically stated that when a fence is cut it was "a rule [that] you have either someone there or you have a gap . . ." and that he personally witnessed cut perimeter fences that were unattended and left lying on the ground by Defendants.

Based on the foregoing, the Court **DENIES** summary judgment on Plaintiff's negligence claim.[11]   Plaintiff has brought forth evidence that Defendants had a duty to act reasonably and that they were unreasonable in their operations in the manner in which they cut fences.

---

[11] Defendants also move for summary judgment on a "negligence cause of action related to the construction of roads."   (MSJ at 23.)   However, the Court has reviewed Plaintiff's complaint and it does not appear that Plaintiff has alleged a negligence cause of action based on the construction of roads; Plaintiff does not allege anything regarding the construction of roads in his negligence cause of action section of his complaint.   Moreover, Plaintiff has not responded to Defendants' arguments regarding summary judgment on a supposed negligence claim predicated on the construction of roads, which leads the Court to conclude that Plaintiff has not asserted such a claim.

<u>CONCLUSION</u>

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment.    (Dkt. # 61.) Plaintiff's claims for (1) breach of contract based on the failure of Defendants to pay for a pump and generator; (2) breach of contract based on the failure to purchase limestone in accordance with the contract; and (3) negligence based on Defendants' actions with respect to cutting fences remain pending.

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, October 31, 2014.

_____

David Alan Ezra
Senior United States Distict Judge

33